## Hunsicker et al. v. Reading Laundries, Inc., et al.

*Stevens & Lee* and *John H. Bertolet*, for plaintiffs.

*Charles W. Matten, Harry R. Matten,* and *Mark C. McQuillen,* for defendants.

SHANAMAN, J., February 19, 1936.—The chancellor filed an opinion and decree nisi, reported in 27 Berks 211, declaring, for reasons stated therein, that a certain sale of 3,816 shares of treasury stock by Reading Laundries, Inc., to James R. Kane, on July 18, 1934, was invalid, and ordering a redelivery of the certificate to be made by James R. Kane to Reading Laundries, Inc., and a reimbursement of the purchase price to be made by Reading Laundries, Inc., to James R. Kane. Defendants filed 14 exceptions to the chancellor's findings of fact and conclusions of law, which have been argued.

The case nearest on its facts to the present is Elliott et al. v. Baker et al., 194 Mass. 518, 80 N. E. 450 (1907). In that case, a controlling faction of the board of directors, but not of the stockholders, sold treasury stock to

one Foster, sufficient in amount that, if he voted with the faction, it could control the corporation. The evidence showed a secret meeting of the faction of directors, a borrowing by Foster from one of the faction of the money needed to buy the treasury stock, a prompt sale by the board to Foster over the protest of minority directors, an immediate delivery of the stock certificate to Foster and payment by him to the company with the borrowed money. The court said, at page 522:

"Such haste does not commonly characterize square business dealings. The price at which the stock was issued, although ordinarily a fair one, was not so much as could have been obtained if the directors had taken advantage of the contest for the control of the corporation. This fact was properly regarded as important as bearing upon the good faith of the defendants and tending to show that their primary purpose in issuing the stock was to oust Elliott and his friends from control. It may well be entitled to even greater weight."

The court further held that Foster "as a reasonable man knew of and participated in the scheme afoot". The court upheld a decree of the lower court canceling the certificate and compelling its return to the corporation. The facts in the above case are substantially repeated in considerable measure in the present case, as appears in the decision of the chancellor. The elements of (1) secret preparations, secret, that is, as to plaintiffs; (2) procuring a loan to the prospective purchaser through the endorsement of some of the defendant directors; (3) sudden presentation of a resolution to sell the treasury stock to the intended buyer; (4) immediate passage of it over the objection of two of the plaintiffs; and (5) immediate delivery on the same day of the stock certificate and payment therefor with the borrowed money are not denied by the present defendants.

In our own State the case nearest in point of fact to the present is Glenn v. Kittanning Brewing Co. et al., 259 Pa. 510. Here our Supreme Court affirmed a decree of

the lower court declaring illegal and invalid a certificate for 50 shares of the capital stock of the corporation, issued to one of the defendants, and ordering its surrender for cancellation. It appeared that defendants, being a majority of the board of directors but minority holders of the stock of the company, authorized by resolution the issuance of unissued shares of the company and, within a week, issued 50 shares to one of the defendants at par. These shares gave defendants the control of the company. That case involved a sale of authorized but unissued stock, and not, as in the Massachusetts case and in the instant case, a sale of treasury stock, and therefore, in this respect, involved facts more favorable to the plaintiffs than those of the latter cases, for the reason that the power of a corporation to deal with its authorized but unissued stock was, under the laws existing at the time of that decision, subject to more restrictions than the power of the company to sell its treasury stock, i. e., stock which it had issued and of which it had subsequently become the owner by lawful reconveyance. The court did, however, in its opinion, expound and enforce the same principles with respect to the good faith required of directors as were laid down in Elliott et al. v. Baker et al., supra.

It is proper that we consider certain points of alleged difference between the instant and the cited cases. Defendants contend that the financial condition of the company afforded a good reason to sell the stock in order to improve that condition. In Elliott et al. v. Baker et al., supra, it was urged that the stock was issued in good faith to procure funds to be used in the business. The court found no such reason to have existed for the increase in capital. In Glenn v. Kittanning Brewing Co., supra, it was argued that the stock was sold in order to be able to pay a demand note of the company. The court, after discussing this point, said, at page 515: "No reason on account of financial conditions of the company was apparent for issuing the additional stock". In the in-

stant case, the chancellor, after finding in fact that the company was in default in the payment of a certain dividend on its preferred stock and in the payment of instalments of principal on a second mortgage, said:

"It is clear that the company owed debts, which it could reduce by the sale of treasury stock and application of the proceeds to the principal of such debts. On the other hand, it is equally clear that the creditors who held probably enforceable claims were not pressing them. The company was not confronted with an emergency; its condition was in no sense critical; it had shown considerable earning power in the past. Nevertheless, we are unable to conclude, on the whole record, that the defendants did not exercise good business judgment in desiring to convert the treasury stock into new capital wherewith to reduce the mortgage."

We find nothing in the record to contradict these statements of the chancellor or to overthrow the conclusion that plaintiffs have not shown that it was not good business judgment to desire to convert the treasury stock into new capital wherewith to reduce the mortgage. While the facts in this case are, therefore, devoid of the element which has been shown to have existed in the two cases cited, the good faith of defendants is still in issue. As the court stated in the Glenn case, at page 515:

"While ostensibly, the purpose in selling the said fifty shares of the unissued capital as aforesaid to Stage, was, as defendants contend, to pay the $6,000 note of the company, then owing to the Safe Deposit & Title Guaranty Company, was that in truth and in fact the real purpose? The circumstances, the surroundings, the existing conditions, the factional troubles, the singleness of purpose pursued, as shown and fairly deducible from the evidence, clearly point to the conclusion that the real, underlying purpose was to obtain control of the corporation".

Was the present sale made in good faith? That is to say, was it characterized by that uberrima fide which is required of the directors of a corporation? Upon this

point defendants contend that there is no evidence of any factional cleavage having existed among the directors. In both the Pennsylvania and Massachusetts cases above cited a faction was found to have existed and a struggle for control. It is true that in the present case the record presents no history of factional warfare or struggle for control prior to the time immediately and shortly before the sale. However, we think there is evidence that two factions did in fact exist and that at least one of them, the defendant directors, sought to obtain as stockholders the control which they already possessed as directors. We do not refer to the evidence of sundry disputes as to business policy, which frequently arise in any board of directors without involving any struggle for control, nor do we give special or controlling weight to the remark of Yorgey, that he thought control should be with the investment, nor to the remarks of Clump. This testimony shows at least, however, that plaintiffs as a group were not in favor with defendants as a group. Furthermore, the answer of defendants to the twenty-fourth paragraph of plaintiffs' bill is significant. That paragraph charges as follows:

"24. Since said sale, the plaintiffs have requested the individual defendants to rescind said sale and have proposed a division of the common stock in some manner which would insure the defendants of an equal control of the company with the plaintiffs, but the individual defendants have refused to rescind the sale or to coöperate in forming such a plan for joint control."

The answer of defendants, as filed, is, with reference to the foregoing paragraph, as follows:

"24. Admitted that the proposal set forth in paragraph 24 of plaintiffs' bill was made; but defendants, directors aver, were unable to rescind such sale, excepting only if James R. Kane agreed thereto, which he has refused to do; further that defendants directors were not interested in obtaining control of the company either for themselves or jointly with the plaintiffs."

In view of the facts that Kane paid for the stock by obtaining the endorsement of three of his codefendants upon his promissory note, that Kane is the son-in-law of Clump, the treasurer of the company, and that Kane is a bookkeeper in the employ of the defendant company, whose operations are controlled by Kane's codefendants, a majority of the directors, the averment that Kane refused to assist in a friendly settlement of their difficulties is further evidence, not merely of bad faith, but that a faction was created at least as early as the forepart of July 1934, which proceeded to concert and put through a plan for the obtaining of stock control of the company. It requires no particular length of time for a faction to form itself and concert a plan whereby to obtain control. If such were the facts, their legal significance is not diminished by the fact that those against whom the faction operated had not regarded themselves prior thereto as a hostile faction.

The mere fact that less than all the directors of a company conceive a business policy which they first discuss among themselves outside of board meetings, and then suddenly introduce in a board meeting and presently adopt over all opposition, does not show a want of good faith. But when to that secrecy and dispatch, neither being called for by any exigency of the company's affairs, the significant fact is added that control was obtained by the said sale, a shadow is cast upon the whole transaction. In view of all the circumstances and after a careful consideration of the record, we all agree that a reasonable man cannot suppose that the sale was in perfect good faith. The significance of the refusal to sell at the increased price to one of the plaintiffs has been sufficiently discussed in the chancellor's opinion. It is, furthermore, an additional circumstance which lends force to the inference of concert to obtain control.

In coming to this conclusion we do not rely upon the facts pressed upon us by plaintiffs to the effect that the company's books and records show entries a few days

after the sale of current liabilities, deferred salaries, in the sum of $4,100 and current liabilities in the further sum of $2,400, representing alleged deferred monthly payments on the principal of a second mortgage. Plaintiffs contend that the item for deferred salaries had never been carried on the books as a liability of any sort during the 82 weeks that the reduction was in effect and had not been included in tax statements; that no item of mortgage payable appears in current liabilities in the company's statement of June 20, 1934; that such item does appear on the company's statement for July 28, 1934, and again disappears from the statement of October 24, 1934, although only $1,800 had been paid on the $2,400 in default. These circumstances, while possibly suggestive, are susceptible of an innocent interpretation and are not necessary to our conclusions.

The chancellor found it unnecessary to his decision to determine in point of fact that the sale was or was not motivated by a concerted arrangement of defendants to obtain stock control. Defendants have excepted to the refusal of the court to find in fact that the sale effected no difference in the control of the company as it had been at the time of the merger of the Bee Hive Laundry. The fact with which we are concerned is, of course, not whether the sale did or did not produce a condition of stock control paralleled by any that existed at any past period of the company's history, but whether or not the sale changed the stock control from one faction to another. Plaintiffs have not excepted to the chancellor's not having determined the point of control alleged to be involved, but have, in their brief, requested leave to file such exceptions nunc pro tunc, if necessary. We are all agreed that a factional fight for control did exist, at least on one side, and that the idea of selling the treasury stock, while justifiable as a business measure, was not put through uberrima fide for that single purpose, but with the equally strong and moving, and possibly primary, purpose of changing the stock control in favor of the majority of the board who au-

thorized and performed the sale. We therefore modify the findings of the chancellor to accord with the above-stated conclusion. Adopting a part of the language of the Glenn case, at page 517:

"The circumstances under which the stock in controversy was issued and purchased . . . were adequate to raise a doubt of the good faith of the directors."

We have therefore unanimously concluded that the sale should be declared void and the stock returned to the treasury and, in order to restore the condition of amity and coöperation under which the business has prospered hitherto, divided in some manner, as is suggested in paragraph 24 of the plaintiffs' bill, which would insure to the opposing parties an equal control of the company. The good faith of plaintiffs in this respect we have no reason to doubt, and the suggestion appears to afford a happy solution which would doubtless subserve the continued prosperity of the company. The parties can best themselves determine the form which such an arrangement may most advantageously take.

Defendants' contention that an action at law for damages is the proper remedy, and not a bill in equity to cancel their certificate, is fully met and answered both by the language of the opinion in the Glenn case, at page 517, and by what the court actually did in that case:

"We cannot agree with the contention that a court of equity is without jurisdiction to set aside the transaction complained of and that plaintiffs' remedy, if any, is by action at law for damages. Where the question of control of the corporation is involved, the remedy at law for damages for an improper sale of stock may be entirely inadequate, and where an averment of fraud on the part of those having management of the company appears, as against the rights and interest of the stockholders, a court of equity has jurisdiction to inquire into the transaction and make such decree as the circumstances may warrant."

Defendants contend that as the company is a Delaware corporation the chancellor is without jurisdiction. We

cannot sustain this contention. The bill was filed July 27, 1934. A hearing was held on August 14th on the question of a preliminary injunction and testimony taken. An answer was filed on September 7th, and final hearing held and testimony taken on December 5th. The notes were filed on January 12, 1935, and the case argued before the chancellor at the March argument court. Upon that argument, counsel for the defendants, both orally and by brief, contended that the court was without jurisdiction because the matter involved the exercise of visitorial powers and an attempted government by this court of the internal affairs of a foreign corporation. This defense had not been raised before, either by demurrer, or in the answer filed, or orally at either hearing, or in the form of objections to testimony. The defense is raised too late. Rule 48 of the Pennsylvania Rules of Equity Practice provides that the defendant may preliminarily object to the bill for a number of specific reasons stated in said rule, and concludes that defendant may preliminarily object that "for any other reason, defendant should not be required to answer the facts averred, since he has a full and complete defense to plaintiff's claim, specifically stated, which does not require the production of evidence to sustain it."

Rule 49, after laying down a procedure in the event defendant objects under Rule 48, goes on to say:

"If this course is not pursued all objections will be deemed finally waived, and defendant must answer within an additional ten days under penalty of having the bill taken *pro confesso*."

While some of the earlier cases stated that the court will not take jurisdiction, the later expressions of the doctrine establish that the courts possess jurisdiction and that the question in each case is one of discretion in its exercise. The courts will not ordinarily take jurisdiction where the internal government of a corporation is involved, but will take jurisdiction where the internal government is not strictly involved, the exercise of visitorial power not required nor a construction of foreign law in-

volving a broad State policy, and where the considerations of justice and its convenient and expeditious administration favor the intervention of the court: Thompson v. Southern Connellsville Coke Co. et al., 269 Pa. 500; Machen v. Machen & Mayer Electrical Mfg. Co., 237 Pa. 212.

" 'The question . . . on close analysis, will be seen to be [not so much] one of jurisdiction, [as] of discretion in exercising jurisdiction. . . . The rule [against interference in internal affairs of a foreign corporation] rests more on grounds of policy and expediency than on jurisdictional grounds; more on want of power to enforce a decree . . . than on jurisdiction to make it'. . . . The question is, Should our courts exercise their jurisdiction under the circumstances of the present case?": Wettengel v. Robinson et al., 288 Pa. 362, 368, 369.

The present case involves an attack by certain directors and stockholders upon a sale of treasury stock by the company. Defendants aver, and plaintiffs deny, that the sale was wise in view of the financial situation of the company. Plaintiffs aver, and defendants deny, that a better price could reasonably have been obtained. Plaintiffs aver, and defendants deny, that the sale was made in bad faith and to accomplish the purpose of the majority directors to obtain control of the company. The chancellor was concerned, therefore, with the internal management of the company and was requested to exercise visitorial powers. But the defendants are in the position that the visitation has already taken place. Two hearings have been held and much testimony taken at both, without objection by the defendants and, in fact, with their coöperation. At both hearings they attended and presented testimony relative to the issues of internal management. They may be taken, as far as they are concerned, to have consented to the exercise of our jurisdiction:

"In other words where a case is presented within the general field of equity jurisdiction, any feature which might lead the court to decline jurisdiction or to relegate

the party to law in the particular case must be seasonably presented or the party will be deemed to have submitted to an adjudication in equity": 21 C. J. 169.

It is still, however, within our judicial discretion to refuse or take jurisdiction; and if circumstances of inconvenience appeared we should give them due weight. No such circumstances appear. Reading Laundries, Inc., is almost entirely a local concern: its charter is its only foreign element. The main office, the business, the business places, the property, appear to be all in Pennsylvania. The parties and the directors are all residents within the jurisdiction. There is no specific testimony that all the property of the corporation is in Pennsylvania, but there is no testimony to the contrary, and, from the history of the incorporation and conduct of the business as gathered from the record—in brief, that this company represents the merger of three local laundries in the City of Reading, Pa.—the only reasonable conclusion is that all the property and business are within the State. A small percentage of the stock is held by the public, and may be held by a nonresident. The fact as to this does not appear. The court can enforce its decree, whereas a suit brought in the State of Delaware, where are to be found neither the parties, the property, nor the business, and where the courts would have personal jurisdiction only of the corporation, would present real difficulties of service and enforcement of a decree. Furthermore, no statute, law, or policy of the State of Delaware is presented to us for interpretation. In view of the foregoing considerations, we are of opinion that we ought now to exercise the jurisdiction which we undoubtedly have.

The chancellor placed the costs upon the defendants. To this, exception has been taken. We all agree that the chancellor's fourth conclusion of law should be modified to exclude the company from liability for the costs.

We sustain the findings of fact of the chancellor and, in addition thereto, find as follows:

*Findings of fact*

22 (additional). On July 18, 1934, there was in existence a faction consisting of a majority of the board of directors of Reading Laundries, Inc.

23 (additional). Said faction, comprising the defendant directors, undertook to obtain stock control of the said company by means of the sale of the treasury stock in question to Mr. Kane.

The chancellor's fourth conclusion of law is modified to read as follows:

*Conclusion of law*

4. The defendants Harry E. Heffner, David O. Yorgey, William J. Clump, A. B. Yorgey, William G. Knapp, and James R. Kane shall pay the costs.

The conclusions of law of the chancellor, except as above modified, are sustained. The exceptions to the findings of fact and conclusions of law, nos. 1 to 5, inclusive, and nos. 7 to 14, inclusive, are dismissed.

From Charles K. Derr, Reading.